[Civ. No. 53017. First Dist., Div. One. Nov. 24, 1982.]

ELVRY STONEHAM et al., Plaintiffs and Respondents, v.
RUTH RUSHEN, as Director, etc., Defendant and Appellant.

730

■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■

**COUNSEL**

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Karl S. Mayer and Thomas P. Dove, Deputy Attorneys General, for Defendant and Appellant.

Michael Satris and Donald Specter for Plaintiffs and Respondents.

**OPINION**

**RACANELLI, P. J.**—This appeal arises against the following background: Under the provisions of the Penal Code (to which all statutory references apply unless otherwise noted) the Director of Corrections (Director), as manager of the state prison system, is charged with the responsibility for the "care, custody, treatment, training, discipline and employment" of all prisoners (§ 5054). Upon arrival at a state prison facility, an inmate is required to undergo an examination of his personal background which thereafter serves as a basis of the Director's decision to "classify [the prisoner] and determine the prison in which the [prisoner] shall be confined." (§ 5068.) The prisoner may also undergo reexaminations to determine whether existing orders should be modified. (§ 5068.)

Historically this classification process entailed an evaluation by a classification committee of the inmate's offense, personal life history and institutional behavior. In February 1980, however, pursuant to an "administrative bulletin" from the Director, the staff of the Department of Corrections (Department) began to employ a classification score sheet (form 839) for new male inmates and a classification review sheet (form 840) for previously classified male inmates in order to compile a numerical score. That score is employed by the Department for purposes of determining the proper level of custody and place of confinement as well as for planning and budgeting considerations.[1]

---

[1]In its enabling legislation providing for construction of new prisons, the Legislature declared its intent that "the department house each inmate at the lowest custody level consistent with his or her classification. . . ." (Stats. 1980, ch. 1122, § 2, p. 3620.)

On April 18, 1980, the Director's predecessor in office adopted regulations broadly defining the classification process. (Cal. Admin. Code, tit. 15, §§ 3375-3376.) On June 25, 1980, the Director issued a superseding administrative bulletin reflecting changes made in forms 839 and 840 and expressly acknowledging that the promulgated score sheets constituted "an integral part in the development of the new classification system."

On November 17, 1980, respondents Stoneham, a San Quentin inmate, and the Prison Law Office, an incorporated association, filed a petition for writ of mandate and declaratory relief seeking to halt implementation of this new classification system until the Director had complied with the notice and hearing requirements of the Administrative Procedure Act (Act). (See Gov. Code, § 11342 et seq.)[2]

On November 19, 1980, the trial court issued a temporary restraining order restraining the Director from making involuntary transfers of San Quentin inmates under the challenged classification system (excluding permissible transfers for reasons of institutional security).

On December 8, 1980, in response to the restraining order, the Director purported to issue an "emergency" regulation without notice as authorized under Government Code section 11346.1. That action resulted in a continuance of the hearing on the order to show cause to allow briefing on the issue of emergency.

On December 17, 1980, the Office of Administrative Law ordered the repeal of the emergency regulation pursuant to Government Code section 11349.6. Thereafter the Director argued for the first time in the trial court that the Act did not apply to the classification rules.

Meanwhile, on December 17, 1980, the trial court entered an interim judgment mandating the Director to discontinue involuntary transfers based solely upon the challenged regulations (excluding classification of new inmates and consensual transfers).

On December 30, 1980, in response to the terms of the interim judgment, petitioners filed a first amended petition seeking the same relief while challenging respondents' claim of emergency in enacting the proposed classification scheme.

---

[2]Respondent Washington, also a San Quentin inmate, was later added as a party plaintiff. Both respondent inmates allege that as a result of their new classification scores they were subject to transfer to other state institutions thus jeopardizing their present work assignments and the continuing support of their friends and family.

On February 26, 1981, following further hearing, the trial court entered its final judgment granting a peremptory writ commanding the Director to cease classification and involuntary transfer of inmates under the challenged rules and regulations contained in the administrative bulletins pending proof of satisfactory compliance with the provisions of the Act.[3] The Director thereafter filed her notice of appeal.

*Venue*

■ Preliminarily we address the Director's contention that proper venue lay in the county of her official residence, namely, Sacramento. (Code Civ. Proc., § 395.) Since the underlying litigation seeks to compel the Director to enact a rule or regulation in compliance with the Act in Sacramento County, it is argued, trial venue in Marin County is improper.

Under the relevant venue provisions of the Code of Civil Procedure, an action against a public officer must be tried in "the county in which the cause, or some part thereof, arose. . . ." (§ 393.)[4] In *Cecil* v. *Superior Court* (1943) 59 Cal.App.2d 793 [140 P.2d 125] [upholding local venue in licensee's mandamus action to set aside Department of Agriculture's revocation order executed in Sacramento County] the court focused on the locus of the injury by enforcement of the order in determining venue under section 393, subdivision (b), reasoning that "It is where the shaft strikes [a citizen], not where it is drawn, that counts. . . . Surely a cause of action does not arise in the county in which a state officer happens to affix his name to an order which is to become operative in another county." (*Id.,* at p. 799.) (Accord *Duval* v. *Contractors State License Board* (1954) 125 Cal.App.2d 532, 535 [271 P.2d 194].) The *Cecil* rule confirming venue in the county in which the alleged injury occurs as a result of official action has been consistently reinforced by our highest state court. (See *Regents of University of California* v. *Superior Court* (1970) 3 Cal.3d 529, 538-539, 542 [91 Cal.Rptr. 57, 476 P.2d 457]; accord *Tharp* v. *Superior Court* (1982) 32 Cal.3d 496, 502-503 [186 Cal.Rptr. 335, 651 P.2d 1141].)

---

[3]Though irrelevant to our discussion, we note that during the interim period successive amendment proposals by the Director were rejected by the Office of Administrative Law essentially on grounds of noncompliance with related provisions of the Act. The administrative decision rejecting the proposed regulation was itself overruled on appeal to the Office of the Governor. (See Gov. Code, § 11349.5.)

[4]Code of Civil Procedure section 393 reads in pertinent part as follows: "(1) Subject to the power of the court to transfer actions and proceedings as provided in this title, the county in which the cause, or some part thereof, arose, is the proper county for the trial of the following actions: . . . [¶] (b) Against a public officer or person especially appointed to execute his duties, for an act done by him in virtue of his office; or against a person who, by his command or in his aid, does anything touching the duties of such officer."

As noted, the official action complained of is the Director's implementation of a classification system without compliance with the provisions of the Act. Although the Director's actions may have occurred in the County of Sacramento, the effects of such action (reclassification of the individually named plaintiffs and threatened transfer to another facility) occurred in Marin County, the county in which the resulting injury was sustained. (*Regents of University of California v. Superior Court, supra,* 3 Cal.3d 529, at p. 542.)[5] We conclude that Marin County was the proper place for trial.

*Mootness*

■ The record discloses that since the date of entry of judgment, the Director initiated proceedings under the Act to amend the 1980 regulations and to incorporate the classification scoring process.[6] Although adoption of the amended regulations would appear to fulfill the conditions of the judgment, the parties contend that the instant appeal is not moot because unsettled questions remain as to the scope and effect of the Act in relation to the administrative bulletins implementing the new classification process. We agree and consider such unresolved questions only insofar as the matters are properly before us.

---

[5]The Director's reliance on an earlier line of cases distinguishing affirmative acts from mere omissions is misplaced. (See e.g., *Bonestell, Richardson & Co. v. Curry* (1908) 153 Cal. 418, 420 [95 P. 887]; *State Commission in Lunacy v. Welch* (1908) 154 Cal. 775 [99 P. 181].) As shown herein, the Director's action in establishing a classification and reclassification system involving transfer and assignment of prison inmates constituted completed affirmative acts as distinguished from threatened action. (See *Regents of University of California v. Superior Court, supra,* 3 Cal.3d 529, 537, fn. 10.)

[6]Regulation 3375 as amended now provides: "(a) All determinations affecting an individual inmate's institution placement, transfer between institutions, participation in available programs, the degree of control and supervision required to maintain custody of the individual, the security of the institution and safety of persons, will be through the inmate classification procedures of the department.

"(b) The classification process for male felon inmates includes a standardized classification scoring system wherein specific weight, positive or negative, is assigned to selected case factors relating to the inmate's precommitment history, commitment offense, and the term of imprisonment. Included in the factors considered are the inmate's military service, history of employment and education, and documented behavior during previous terms of imprisonment. Higher initial scores will result in case histories reflecting among other negative factors; physically assaultive behavior, drug involvement, escapes, and failure to participate in assigned work, vocational or educational programs during previous terms of imprisonment. Lower initial scores will result in case histories that reflect fewer negative factors and positive participation in assigned work, vocational or educational programs during previous terms of imprisonment.

"(c) Each male felon inmate's classification score is recalculated periodically, but no less often than every 12 months. Additional selected and weighted case factors relating to the inmate's favorable and unfavorable conduct while incarcerated are considered in the recalculated classification score. Factors considered in the recalculation focus on the inmate's documented behavior. A finding of guilt for any Serious rule violation as described in Section 3315 or failure to participate in assigned work, vocational or educational programs will result in a score increase. A reduction in score will result from positive participation in assigned work, vocational or educational programs and the lack of Serious rule violations.

"(d) An inmate may be housed in an institution with a different custody level than would or-

*Compliance With the Act*

█ The primary question is whether the Director was required to comply with the notice and hearing requirements of the Act (Gov. Code, § 11342 et seq.) before issuing "administrative bulletins" implementing the new standardized classification system established under the regulations. As earlier noted, the Director is statutorily empowered to examine each prisoner and thereupon to classify the prisoner to determine the prison in which he will be confined. (§ 5068.) The Director is further authorized to "prescribe and amend rules and regulations for the administration of the prisons." (§ 5058.) The Legislature has expressly declared that such rules and regulations must be promulgated and filed in accordance with the relevant provisions of the Act. (§ 5058.)

But, not all directives are subject to the Act. The Act does not apply to (1) a rule relating "only to the internal management of the state agency" or (2) "any

dinarily be required of the inmate's classification score, as an administrative exception when the department's need, the inmate's individual needs, or safety and security requirements are determined to warrant an exception.

"(e) The classification process will begin upon the reception of a person committed to the custody of the Director of Corrections and will continue throughout the entire time the individual remains under the jurisdiction of the Director of Corrections.

"(f) Reclassification, or reevaluation, will be an ongoing process of reviewing the individual inmate's needs, interests and desires, in keeping with the institution's and the department's responsibilities as to the effect on the individual, other inmates, staff and public safety.

"(g) Whenever possible, the inmate will be given written notice sufficiently in advance of a hearing before a classification committee, in order to be reasonably prepared to discuss the purpose, reasons or issues to be considered at the hearing. When it is known or can be anticipated by a classification committee, an inmate appearing before the committee will be informed when he or she will again routinely appear before a classification committee. The inmate will always be given a written statement of the results of any classification committee hearing.

"(h) Except as provided in Section 3383, the inmate shall be present at all initial classification committee hearings and at all classification committee hearings which may have an adverse effect upon his or her current conditions of confinement. An inmate will be informed of an initial hearing or of an unscheduled hearing wherein an adverse effect is anticipated at least 72 hours prior to the hearing. Absentia hearings are authorized only under the following circumstances:

"(1) The inmate refuses to appear before the committee.

"(2) The inmate is physically incapable of appearing before the committee, or mentally incompetent to participate and understand the purpose of the hearing as determined by a psychiatrist.

"(3) The predetermined purpose of the hearing is to reduce or remove a restriction upon the inmate.

"(4) The predetermined purpose is to approve an action requested in writing by the inmate.

"(5) The purpose of the hearing is for a routine progress review to determine the need for scheduling a future classification committee action. When an absentia hearing is held for any reason, the fact and the reason will be included in the committee's documentation of the hearing.

"(i) When a classification hearing includes the consideration of a newly calculated or recalculated classification score, the inmate shall be provided with a copy of the completed scoring form at least 72 hours in advance of the hearing, as provided in subsection (d) for an adverse hearing. An inmate may contest the classification score in the hearing and may appeal the classification score if dissatisfied with the decisions or recommended actions of the hearing."

Regulation 3376 relating to institutional classification operational plans remains unchanged.

form prescribed by a state agency or any instructions relating to the use of the form." (Gov. Code, § 11342, subd. (b).)

The Director argues that the procedural details contained in the administrative bulletins merely implement the statement of policy set forth in regulation 3375 and fall within either or both of the statutory exemptions. Plaintiffs, on the other hand, steadfastly insist that because the classification system determines the custody level of a prisoner and the institution in which he will be housed, the critical point-scoring system represents a rule of general application which must be adopted in compliance with the Act. We agree.

In *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744], the court determined that a board rule relating to an employee's withdrawal of his resignation did not fall within the "internal management" exemption. The court reasoned that the implementing rule involving termination of employment was "a matter of import to all state civil service employees. It is not a rule governing the board's internal affairs." (*Id.*, at p. 203; see also *Ligon* v. *State Personnel Board* (1981) 123 Cal.App.3d 583 [176 Cal.Rptr. 717] [policy relating to out-of-class experience].) In so holding the Supreme Court cited with approval our decision in *City of San Marcos* v. *California Highway Com.* (1976) 60 Cal.App.3d 383 [131 Cal.Rptr. 804], involving a state agency's disallowance of a city's application for allocation of grade separation funds on grounds the underlying railroad crossing agreement had been submitted after the deadline for that year's application. In rejecting the agency's claim that the deadline requirement was exempted under the internal management exception provided by the Act, we reasoned that: "Respondents have confused the internal rules which may govern the department's procedure in developing *its* applications for funds for *its own* projected grade crossings, and the rules necessary to properly consider the interests of all who will seek consideration under the provisions of the statutes dealing with review and allocations." (*Id.*, at p. 408; italics added.)

A similar result is compelled herein. The classification scheme employed by the Director and the Department extends well beyond matters relating solely to the management of the internal affairs of the agency itself. Embodying as it does a rule of general application significantly affecting the male prison population in the custody of the Department, such a comprehensive classification system is not exempt as a rule of internal management from mandatory compliance with the Act.

Nor, as alternatively contended, does the standardized scoring system fall within the statutory exemption relating to operational forms. The use of a standardized score sheet to achieve a classification formerly determined on a subjective basis brings about a wholly new and different scheme affecting the

placement and transfer of prisoners. Consequently, such uniform substantive proposals contained in the adminstrative bulletins designed to implement the classification system must be promulgated in compliance with the Act.

In conclusion, we agree with the trial court that the Director was required to follow the notice and hearing procedures (Gov. Code, §§ 11346.4-11346.8) prior to implementing the standardized classification system. We express no opinion, however, as to whether the existing regulation 3375, as adopted after the judgment below, is sufficiently detailed to satisfy the requirements of the Act. That matter was neither raised at trial nor briefed on appeal. Accordingly, in the absence of an adequate record presenting that precise question for determination, the issue is premature and we decline to reach it.

The judgment is affirmed and the matter remanded for such further proceedings as may be appropriate and consistent with the views expressed herein.

Elkington, J., and Newsom, J., concurred.