[No. A120115. First Dist., Div. Five. Nov. 21, 2008.]

MICHAEL MORALES et al., Plaintiffs and Respondents, v.
CALIFORNIA DEPARTMENT OF CORRECTIONS AND
REHABILITATION et al., Defendants and Appellants.

## COUNSEL

Edmund G. Brown, Jr., Attorney General, David S. Chaney, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Thomas S. Patterson and Michael J. Quinn, Deputy Attorneys General, for Defendants and Appellants.

Munger, Tolles & Olson, Bradley S. Phillips, Grant A. Davis-Denny and Eric P. Tuttle for Plaintiffs and Respondents.

## OPINION

**SIMONS, Acting P. J.**—The treatment and management of condemned inmates from the time an execution date is set through completion of the execution is subject to a protocol issued on May 15, 2007, by the California Department of Corrections and Rehabilitation (CDCR) and CDCR Secretary James E. Tilton (Tilton) (collectively appellants).[1] The protocol, Operational Procedure No. 0-770, is formally titled "STATE OF CALIFORNIA SAN QUENTIN OPERATIONAL PROCEDURE NUMBER 0-770: EXECUTION BY LETHAL INJECTION" (hereafter OP 770). Two condemned inmates, respondents Michael Morales and Mitchell Sims, challenged the validity of OP 770,[2] arguing it had been adopted without compliance with the requirements of the Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.). The trial court agreed, granted respondents' summary judgment motion and enjoined appellants from carrying out the lethal injection of any condemned inmates under OP 770 unless and until that protocol is promulgated in compliance with the APA.

Appellants raise two principal challenges to the trial court's ruling. They argue OP 770 is not subject to the APA because it is not a rule of "general application." Further, they contend OP 770 qualifies for the "single facility exception" to the requirements of the APA, set forth in Penal Code section 5058, subdivision (c)(1) (hereafter section 5058(c)(1)).[3] We affirm.

---

[1] The CDCR Secretary is head of the CDCR, with overall responsibility for all of the institutions within the CDCR. (See Pen. Code, § 5054.)

[2] In 2006, an earlier version of OP 770 was challenged on Eighth Amendment grounds by Morales in the United States District Court. (*Morales v. Tilton* (N.D.Cal. 2006) 465 F.Supp.2d 972.) In response to the district court's December 2006 decision, appellants, overseen by the CDCR undersecretary of operations, K.W. Prunty, Jr., adopted the revised version of OP 770 presently at issue.

[3] All undesignated section references are to the Penal Code.

## BACKGROUND

San Quentin State Prison (San Quentin) is the only prison authorized to execute California inmates. (§ 3603.) Pursuant to section 3604, unless a condemned inmate affirmatively elects to be executed by lethal gas, executions are performed by lethal injection. OP 770 was adopted by the CDCR to implement section 3604. The protocol states the following purposes and objectives:

"A. The purpose of this procedure is to establish appropriate guidelines for the execution of condemned inmates in compliance with the laws of the State of California and the United States.

"B. The objectives of this procedure are:

"1. To establish the care, treatment and management of condemned inmates from the time an execution date is set through the completion of the execution.

"2. To establish criteria for the selection, training, and oversight of the Lethal Injection Team.

"3. To delineate specific duties and responsibilities of personnel in preparation for and completion of the execution by lethal injection of condemned inmates.

"4. To ensure direct supervision and managerial oversight of the Lethal Injection Process."

OP 770 states the procedure is subject to the approval of the San Quentin Warden (Warden) and the CDCR Secretary. It provides, "The Warden is responsible for the recruitment, selection, retention, and training of all staff involved in the Lethal Injection process" and "for managerial oversight and overall implementation of this procedure."

OP 770 provides that, upon receipt of the execution order, the Warden and certain other designated officials interview the condemned inmate and serve the warrant of execution. The inmate is informed of "the choices of execution method," and is instructed to indicate his choice within 10 days on a prescribed form. Further, he is informed that "if no choice is made, lethal injection will be the method of execution."

As to the recruitment, screening and selection of lethal injection team members, OP 770 provides in part:

"a. With the assistance of the Director, Division of Adult Institutions (DAI),[4] the Warden will coordinate the recruitment and selection of Lethal Injection Team Members. The Lethal Injection Team will consist of a minimum of 20 members. The total number of Lethal Injection Team Members will be determined by the Warden.

"b. In the event the Warden is unable to field a sufficient number of qualified Lethal Injection Team Members, the Warden will contact the Director, DAI, to coordinate the identification of additional potential candidates for team membership. Prospective team members will be selected from departmental locations[5] as determined appropriate by the Director, DAI.

"c. The hiring authorities from designated locations will select prospective team members from personnel assigned to their respective areas of responsibility consistent with selection criteria [enumerated in OP 770]. The hiring authorities will forward the names and classifications of prospective team members to the Director, DAI."

OP 770 provides that the DAI Director will ensure that a sufficient number of lethal injection team members will be maintained.

As to news media witnesses at executions, OP 770 provides, "When an execution is scheduled, the CDCR, Assistant Secretary, Office of Public and Employee Communications,[6] will notify the media and establish a 10-day filing period in which media may request to witness the execution." It further provides, "The Assistant Secretary, Office of Public and Employee Communications, and the San Quentin Public Information Officer will consult with the Warden to select the members of the news media to witness an execution." OP 770 also provides: "The San Quentin Public Information Officer and Assistant Secretary, Office of Public and Employee Communications will be responsible for all CDCR press releases prior to, during and after an execution and for the developing of all information releases."

As to the chronology of events prior to an execution, OP 770 provides that approximately 30 days prior to an execution, the CDCR Secretary will notify the Governor's legal affairs secretary in writing of all referrals made to the

---

[4] The DAI Director serves above the Warden in the chain of command.

[5] In his deposition, Tilton confirmed that "departmental locations" refers to CDCR prisons and facilities aside from San Quentin.

[6] The CDCR Assistant Secretary, Office of Public and Employee Communications, does not serve under the Warden in the chain of command.

Marin County District Attorney's office for sanity review requests under section 3701. Approximately 10 days before an execution, the Warden will compile and send a final seven-day report regarding any changes to the inmate's mental condition to the DAI Director, whose office will forward it to the Governor's legal affairs secretary.

OP 770 is available for review by condemned inmates at San Quentin and by the general public.

*Summary Judgment Motions*

In October 2007, the parties filed cross-motions for summary judgment and alternatively for summary adjudication of issues on the question of whether OP 770 is valid despite the lack of compliance with the public notice and comment requirements of the APA. (§ 5058, subd. (a).) The court granted respondents' summary judgment motion and denied appellants' summary judgment motion.

## DISCUSSION

Appellants contend the trial court erred in its rulings on the dueling summary judgment motions. "The rules of review are well established. If no triable issue as to any material fact exists, the [moving party] is entitled to a judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo. [Citations.]" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499 [64 Cal.Rptr.3d 803, 165 P.3d 581].)

I. *The APA*

■ Section 5058, subdivision (a)[7] requires the CDCR Secretary to promulgate rules and regulations for the administration of prisons pursuant to the APA, unless enumerated exceptions apply. The APA was enacted to establish basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations promulgated by administrative agencies. (Gov. Code, § 11346; *Grier v. Kizer* (1990) 219 Cal.App.3d 422, 431 [268 Cal.Rptr. 244], disapproved on other grounds in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 577 [59 Cal.Rptr.2d 186, 927 P.2d

---

[7] Section 5058, subdivision (a), provides in relevant part: "The [CDCR Secretary] may prescribe and amend rules and regulations for the administration of the prisons. . . . [¶] The rules and regulations shall be promulgated and filed pursuant to [the APA], except as otherwise provided in this section and Sections 5058.1 to 5058.3, inclusive."

296] (*Tidewater*).) A major purpose of the APA is to provide a procedure for persons or entities affected by a regulation to be heard on the merits in its creation, and to have notice of the law's requirements so they can conform their conduct accordingly. (*Tidewater*, at pp. 568–569.) Because of this, any doubt as to the applicability of the APA's requirements should be resolved in favor of the APA. (*United Systems of Arkansas, Inc. v. Stamison* (1998) 63 Cal.App.4th 1001, 1010 [74 Cal.Rptr.2d 407]; *Grier*, at p. 438.)

■  " 'If a rule constitutes a "regulation" within the meaning of the APA (other than an "emergency regulation," which may not remain in effect more than 120 days) it may not be adopted, amended, or repealed except in conformity with "basic minimum procedural requirements" (Gov. Code, § 11346, subd. (a)) that are exacting. The agency must give the public notice of its proposed regulatory action (*id.*, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (*id.*, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (*id.*, § 11346.8); respond in writing to public comments (*id.*, §§ 11346.8, subd. (a), 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (*id.*, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity. (*Id.*, §§ 11349.1, 11349.3.) Any regulation or order of repeal that substantially fails to comply with these requirements may be judicially declared invalid. (*Id.*, § 11350.)' [Citation.]
■  The procedural requirements of the APA 'shall not be superseded or modified by any subsequent legislation except to the extent that the legislation shall do so expressly.' (Gov. Code, § 11346, subd. (a); [citations].)" (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333 [42 Cal.Rptr.3d 47, 132 P.3d 249] (*Morning Star*).)

■  The APA defines " '[r]egulation' " as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.) " 'A regulation subject to the APA . . . has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must "implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure." [Citation.]' " (*Morning Star, supra*, 38 Cal.4th at pp. 333–334, quoting *Tidewater, supra*, 14 Cal.4th at p. 571.) Appellants do not dispute that

OP 770 implements the statutory directive in section 3604, thus satisfying *Tidewater*'s second identifying characteristic of a "regulation."

## II. *OP 770 Is a Rule of General Application*

Appellants rely on three APA cases regarding prison rules (*In re Garcia* (1998) 67 Cal.App.4th 841 [79 Cal.Rptr.2d 357] (*Garcia*); *Faunce v. Denton* (1985) 167 Cal.App.3d 191 [213 Cal.Rptr. 122] (*Faunce*); and *Stoneham v. Rushen* (1982) 137 Cal.App.3d 729 [188 Cal.Rptr. 130] (*Stoneham*)) to contend OP 770 is not a regulation subject to the APA, because it does not constitute a rule of general application. Appellants assert that because OP 770 applies only to certain condemned inmates housed at San Quentin and execution team members who are trained at San Quentin and perform their duties there, OP 770 does not affect a broad range of prisoners.

*Garcia, Stoneham* and *Faunce* provide little assistance in resolving this matter. In *Stoneham*, two prison inmates and a nonprofit prisoners' rights organization challenged the adoption of regulations standardizing the system used by the CDCR to classify inmates for purposes of determining their prison assignment. They asserted the CDCR failed to comply with the APA in adopting the regulations. (*Stoneham, supra*, 137 Cal.App.3d at p. 732.) The *Stoneham* court concluded that the CDCR's classification scheme embodied "a rule of general application significantly affecting the male prison population" in CDCR custody. (*Id.* at p. 736.) *Faunce* was a class action by Folsom State Prison inmates against the CDCR director and other prison officials challenging the implementation and enforcement of "revised chapter 4600 of the [CDCR] Administrative Manual" (*Faunce, supra*, 167 Cal.App.3d at p. 193), which governed the amount and type of personal property inmates throughout the department's system could possess in their cells. The plaintiffs alleged chapter 4600 was invalid because it was not promulgated pursuant to the APA. (*Faunce*, at pp. 193–194.) In reliance on *Stoneham, Faunce* concluded that chapter 4600 was a rule of general application significantly affecting the male prison population in CDCR custody and was therefore subject to APA compliance. (*Faunce*, at p. 196.)

*Stoneham* and *Faunce* determined that certain regulations affecting the entire male prison population were rules of general application. Neither, however, is authority for appellants' argument that *only* such broadly applicable directives are subject to the APA.

The *Garcia* case is far more apt and directly addresses whether a prison regulation of more limited scope than those in *Stoneham* and *Faunce* is governed by the APA. If we agreed with *Garcia*'s analysis of this issue, appellant would prevail; but we do not.

In *Garcia*, an inmate (Garcia) incarcerated at a California medical facility sought habeas corpus relief after his request for permission to correspond with an inmate at another prison, Richard J. Donovan Correctional Facility (Donovan prison), was denied by that prison, in reliance upon its correspondence policy. That policy limited correspondence between Donovan prison inmates and inmates housed at other institutions. (*Garcia, supra*, 67 Cal.App.4th at p. 843.) Garcia challenged the Donovan prison policy on the ground it was a regulation of general application not promulgated pursuant to the APA. (*Garcia*, at pp. 843, 845.) The prison authorities made two separate arguments as to why the APA did not apply: First, they argued the Donovan prison policy was not one of "general application," and second, even if it were, the policy was exempt from compliance with the APA under section 5058(c)(1) because it applied to only one prison facility. In its analysis of "general application," the *Garcia* court noted that the APA does not define this term, but suggested, in dicta, that in the prison context a rule is of general application where it significantly affected a "broad range of prisoners." (*Garcia*, at pp. 844–845.) *Garcia* then concluded a correspondence policy that applied to a single prison did not have this effect and, so, was not a rule of general application. (*Id.* at p. 845.)

The flaw in *Garcia*'s reasoning results from conflating the APA's definition of a subject regulation (one of general application) and the Penal Code's subsequent creation of an exception to the APA for regulations affecting only one prison. If, categorically, a regulation applicable to a single prison lacked general applicability, there would have been no need for the Legislature to enact the single prison exception contained in section 5058(c)(1). That said, the result in *Garcia* seems correct. The Donovan prison regulation appears to apply to a broad range of prisoners, *all* those at Donovan prison, but was exempt from the APA because it *only* applied to inmates at that facility.[8]

Thus, the prison cases principally relied upon by appellants fail to assist us in refining the ambit of the term "general application" as utilized in the APA. In reviewing cases decided in other states on the applicability of their administrative procedures acts to a lethal injection protocol similar to OP 770, we find one case apt. In *Evans v. State* (2006) 396 Md. 256 [914 A.2d 25], a state prison inmate sentenced to death sought an injunction against application of the Maryland Department of Correction's protocols governing the use of lethal injection because they were not enacted in accordance with the procedures mandated by the Maryland Administrative Procedure Act (MAPA). (*Evans*, 914 A.2d at pp. 33–34.) At issue in *Evans*, as here, was whether the protocols were subject to the MAPA. (*Evans*, at pp. 78–79.)

---

[8] *Garcia*'s discussion of the single prison exception is considered in part III., below.

Title 10, subtitle 1 of the State of Maryland Government Article section 10-101(g)(1), "defines a regulation as including, in pertinent part, a statement that has general application." (*Evans*, at p. 78.) *Evans* rejected the argument that the protocols were not regulations because they did not have a general application. "The State's argument to the contrary notwithstanding, there can be no legitimate doubt that the portion of the [protocols] that govern the method of and procedure for administering the lethal injection have general application . . . . They have general application . . . because they comprehensively govern the manner in which every death sentence is implemented." (*Ibid.*)

We agree with *Evans*. The record reflects that as of September 11, 2006, there were 644 condemned inmates in California; no evidence was submitted to the trial court as to the precise number of inmates who have had an execution date scheduled.[9] But those numbers are not determinative. All condemned inmates who have received an execution date are covered by OP 770 until a method of execution is selected. Unless the inmate affirmatively selects the use of lethal gas, all death sentences will be by lethal injection and will be carried out consistently with the remainder of the challenged protocol. Thus, the protocol " 'declares how a certain class' " of inmates, those whose execution dates have been set, will be treated. (*Morning Star, supra*, 38 Cal.4th at pp. 333–334, quoting *Tidewater, supra*, 14 Cal.4th at p. 571.) Therefore, the protocol is subject to the APA, even if it does not apply to all inmates, or even to all inmates sentenced to death.

III. *OP 770 Is Not Subject to the Single Prison Exception in Section 5058(c)(1)*

■   Section 5058(c)(1) provides that "Rules issued by the [CDCR Secretary] applying solely to a particular prison or other correctional facility" are "deemed not to be 'regulations' as defined in [the APA]." In applying this subdivision to the Donovan prison mail policy, *Garcia* held, "[t]he local nature of the Donovan policy is evidenced by the wide variety of policies found throughout the state." (*Garcia, supra*, 67 Cal.App.4th at p. 845.) The "correspondence policy applies solely to correspondence entering or leaving Donovan. It applies to Donovan inmates in all instances. Inmates housed at

---

[9] In support of their assertion that OP 770 affects only a small number of prison inmates, appellants request that we take judicial notice of: (1) CDCR's "Weekly Report of Population," as of February 11, 2008; (2) CDCR's " 'Condemned Inmate Summary List,' " as of February 11, 2008; and (3) a portion of CDCR's Web site regarding San Quentin. We deny the request because these documents were not before the trial court. (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242].)

other institutions are controlled by that institution's correspondence policies. Inmates housed at other facilities are affected by Donovan rules only if they seek to correspond with Donovan inmates. However, their ability to correspond with any other individual is unaffected." (*Ibid.*)

*Garcia* clarifies that a prison policy's incidental impact upon individuals who are not employees or inmates of the issuing facility does not bar application of section 5058(c)(1). OP 770 imposes limitations on an inmate's visitors as the execution date approaches. Under *Garcia*, the incidental impact on these visitors does not, itself, preclude application of the single prison exception. In other respects, however, the protocol substantially governs behavior outside San Quentin.[10] For example, OP 770 regulates the selection of lethal injection team members and specifies that, if the Warden is unable to field a sufficient number of qualified lethal injection team members, the DAI Director will coordinate the identification of additional potential candidates for team membership from *other* CDCR prisons and correctional facilities. And the hiring authorities from those other prisons and correctional facilities (usually, but not always, the warden) will select prospective team members consistent with selection criteria enumerated in OP 770. In addition, the protocol assigns tasks to the CDCR Secretary, the CDCR Assistant Secretary, Office of Public and Employee Communications, and the DAI Director, none of whom serves under the Warden or works at San Quentin. Thus, OP 770 directs the performance of numerous functions beyond San Quentin's walls.

IV. *Appellants May Not Rely on the Internal Management Exception in Government Code Section 11340.9*

Finally, and for the first time on appeal, appellants contend that if the provisions of OP 770 regarding selection of the lethal injection team are not covered by the single facility exception, we should apply the internal management exception of Government Code section 11340.9, which provides: "This chapter [the APA] does not apply to . . . [¶] . . . [¶] (d) A regulation that relates only to the internal management of the state agency."[11] Appellants argue that the "execution-team selection process . . . merely

---

[10] Appellants presented evidence that *if* an execution date was set for a condemned female inmate housed at the Central California Women's Facility (CCWF), or a male condemned inmate housed outside San Quentin at the time his execution date was set, CCWF or that other male prison *would* be required to prepare a written execution procedure specific to that institution. However, no such operational procedure(s) currently exist, and the trial court correctly rejected this evidence as speculative.

[11] Effectively, the argument assumes an agency may defend its failure to comply with the provisions of the APA by "splitting" the challenged regulation into two or more pieces and justifying each piece with a different exception. Given our resolution of this case we need not and do not address the validity of this assumption.

identifies which prison employees are eligible to perform one of many state functions that concern inmates." This argument is rejected as untimely.

■   Appellants acknowledge that, generally, theories not raised in the trial court may not be raised for the first time on appeal. (*McDonald's Corp. v. Board of Supervisors* (1998) 63 Cal.App.4th 612, 618 [74 Cal.Rptr.2d 101].) In their reply brief, they rely on an exception to this rule that a question of law on undisputed facts may be raised for the first time on appeal. (*Ibid.*) An appellate court is not required to consider any new theory on a pure question of law; rather, whether to do so is a matter within the court's discretion. (*Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7 [4 Cal.Rptr.3d 171].)

As discussed in part III., above, the selection of the lethal injection team is governed by OP 770, which provides in pertinent part: "c. The hiring authorities from designated locations will select prospective team members from personnel assigned to their respective areas of responsibility consistent with selection criteria listed below. The hiring authorities will forward the names and classifications of prospective team members to the Director, DAI. [¶] . . . [¶] 3[.] If necessary, specialists may be contracted to perform specific duties during the Lethal Injection Process." (Hereafter subsection c.3.)

Nothing in subsection c.3. identifies the employee who decides if it is necessary to contract with outside specialists or the employee who actually contracts with them.[12] More to the point, subsection c.3. does not state whether these decisions are to be made solely by employees of the CDCR. And, because appellants never argued for the internal management exception in the trial court, no discovery was conducted to determine if the contracting authority was a member of the CDCR staff. It would be unfair to respondents to *assume* that this is so, particularly because appellants never specifically address subsection c.3. in their briefing.[13]

## V.   Conclusion

■   The procedural requirements designated by the APA for administrative regulations are applicable to OP 770. Appellants' failure to comply with them invalidates the challenged protocol.

---

[12] The "hiring authorities" referred to in subsection c.3. are the wardens of other prisons whose personnel are selected to supplement the lethal injection teams.

[13] We note that appellants' newly raised internal management argument addresses only one of the numerous provisions of OP 770 that assign tasks to individuals who do not work at San Quentin. See part III., above.

## DISPOSITION

The judgment is affirmed.

Needham, J., and Reardon, J.,* concurred.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.