[No. A122485. First Dist., Div. Four. July 26, 2010.]

CALIFORNIA SCHOOL BOARDS ASSOCIATION et al., Plaintiffs and Appellants, v.
STATE BOARD OF EDUCATION, Defendant and Respondent;
ASPIRE PUBLIC SCHOOLS, INC., Real Party in Interest and Respondent.

1300

**1304**

---

**COUNSEL**

Olson, Hagel & Fishburn, Deborah B. Caplan, N. Eugene Hill and Richard C. Miadich for Plaintiffs and Appellants California School Boards Association, Association of California School Administrators and Stockton Unified School District.

Joseph R. Colton and Priscilla Winslow for Plaintiffs and Appellants California Teachers Association.

Edmund G. Brown, Jr., California Attorney General, Susan M. Carson and Benjamin J. Riley, Deputy Attorneys General, for Defendant and Respondent.

Middleton, Young & Minney, Paul C. Minney and Andrew G. Minney for Real Party in Interest and Respondent.

**OPINION**

**RIVERA, J.**—Charter schools are public schools that operate independently from, but with oversight by, the school districts or county boards of education that approve their charters. Before 2002, charter schools operated without geographic restrictions; a school chartered in Los Angeles could operate "satellite" campuses as far away as Palo Alto or Mendocino.[1] In 2002, after it came to light that a school chartered in Fresno but operating satellites in farflung locations had accumulated $1.3 million in debt and was involved in other irregularities,[2] the Legislature amended the Charter Schools Act of 1992 (Ed. Code,[3] § 47600 et seq.) (CSA) to require that charter schools be located within the districts or counties where they are chartered (see, e.g., §§ 47605, subd. (a)(1), 47605.1). The Legislature also added section 47605.8. Subdivision (a) of section 47605.8 authorized the State Board of Education (the State Board or Board) to approve statewide charters that would allow a school to operate without the geographic restrictions. Subdivision (b) of section 47605.8, however, provided that the State Board could not approve a statewide charter unless it first made a finding that "the proposed state charter school will provide instructional services of statewide benefit that cannot be provided by a charter school operating in only one school district, or only in one county."

In 2007 the State Board approved a statewide charter for Aspire Public Schools, Inc. (Aspire). The California School Boards Association (CSBA) and others filed an action challenging this approval, contending that the State Board failed to determine and make a finding that Aspire's instructional services of a statewide benefit could not be provided through individual charters from local school districts. The State Board and Aspire demurred. They contended, and the trial court ruled, that section 47605.8, subdivision (b) requires the State Board to find the proposed charter school will provide "instructional services of statewide benefit," but does *not* require the Board to find, in addition, that the statewide benefit could not be provided through locally approved charters. We conclude that such a finding is required and, accordingly, we reverse.

The petition and complaint contains two other causes of action seeking mandamus. Petitioners allege (1) the State Board has failed and refused to enforce the conditions of approval imposed on Aspire's charter and should be compelled to do so; and (2) the State Board used policies and procedures in

---

[1] Senate Committee on Education, Analysis of Assembly Bill No. 1994 (2001–2002 Reg. Sess.) as amended June 19, 2002, page 2 (Senate Education Analysis of Assembly Bill No. 1994).

[2] Senate Education Analysis of Assembly Bill No. 1994, *supra*, pages 1–2.

[3] All statutory references are to the Education Code unless otherwise stated.

connection with its consideration of statewide charter petitions that have not been adopted in accordance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA) and, therefore, the State Board should be compelled to set aside its approval of Aspire's charter. The trial court sustained demurrers to these causes of action. We reverse as to these claims as well.

## I. PARTIES TO THE ACTION

CSBA, the California Teachers' Association, the Association of California School Administrators, and the Stockton Unified School District (SUSD) (collectively referred to as petitioners) sued the State Board as respondent/defendant and Aspire as real party in interest, seeking a writ of mandate and injunctive and declaratory relief. The State Board and Aspire will be referred to collectively as respondents.

The State Board is the "governing and policy making body for the California Department of Education." Aspire is a nonprofit corporation that operates numerous charter schools under charters approved by local school districts or county boards of education, including schools in the Los Angeles Unified School District (LAUSD) and in the SUSD.

## II. STATUTORY AND REGULATORY SCHEME

This controversy can best be understood within its statutory framework. We begin, therefore, with a summary of the relevant portions of the CSA and related regulations.

### A. *The CSA*

In 1992 the Legislature enacted a statutory scheme to allow the establishment and operation of charter schools. (§ 47600 et seq.) The intent was to provide opportunities for teachers, parents, and students to establish schools that operate independently from the school district in order to improve learning; create learning opportunities, especially for those who are academically low achieving; encourage innovative teaching methods; create new opportunities for teachers; provide parents and students expanded choices in the types of educational opportunities available; hold the charter schools accountable for meeting quantifiable outcomes; and provide "vigorous competition within the public school system to stimulate continual improvements in all public schools." (§ 47601.)

A charter school is established by submitting to the governing board of a school district a petition signed by a number of parents equal to at least half

of the proposed enrollment, or signed by a number of teachers equal to at least half the number of teachers anticipated at the school. (§ 47605, subd. (a)(1).) The petition must contain a "reasonably comprehensive" description of numerous pedagogical, administrative, and financial components; and myriad other provisions demonstrating adequate plans for good governance, proper testing, an appropriate disciplinary system, financial reporting, and regular consultations with parents. (*Id.,* subd. (b)(5)(A)–(P).)

After a public hearing, the district's board decides whether to grant or deny the petition, "guided by the intent of the Legislature that charter schools are and should become an integral part of the California educational system and that establishment of charter schools should be encouraged." (§ 47605, subd. (b).) A district board's discretion to deny a charter petition is limited. The statute provides that a school district "*shall* grant a charter . . . if it is satisfied that granting the charter is consistent with sound educational practice." (*Ibid.,* italics added.) Similarly, the district board can deny the petition only if it makes "written factual findings, specific to the particular petition, setting forth specific facts to support one or more of the following findings: [¶] (1) The charter school presents an unsound educational program . . . . [¶] (2) The petitioners are demonstrably unlikely to successfully implement the program set forth in the petition. [¶] (3) The petition does not contain the number of signatures required . . . . [¶] (4) The petition does not contain an affirmation [that the school will be tuition free, nonsectarian, and nondiscriminatory]. [¶] (5) The petition does not contain reasonably comprehensive descriptions of [each of the statutorily required components]." (*Ibid.*)

If the district's board denies the petition, the petition may be submitted to the county board of education—in effect, an appeal of the denial—which must grant or deny the petition applying the same statutory requirements. If the county board denies the petition, it may be submitted to the State Board, which must also apply the same statutory standards. (§ 47605, subd. (j)(1).) The body that grants the charter is the chartering authority and is required to carry out statutorily mandated oversight duties. (§ 47604.32.)

B. *The 2002 Amendments*

In 2002 the Legislature amended the CSA. Significant among the amendments was the addition of stringent geographical restrictions for the operation of charter schools. (See §§ 47605, subd. (a)(1), 47605.1; Stats. 2002, ch. 1058, §§ 6, 7.)[4] The impetus behind those amendments, which were sponsored by the State Superintendent of Public Instruction, was explained in an analysis

---

[4] On our own motion we take judicial notice of the legislative history of Assembly Bill No. 1994 (2001–2002 Reg. Sess.). (Evid. Code, § 452; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26 [34 Cal.Rptr.3d 520].)

prepared for the Senate Committee on Education. "The [State Board] has in practice allowed single charters to be used to authorize the operation of multiple school sites, which are called 'satellites' of the charter. Satellites have often operated at considerable distance from the 'home' charter. Early this year the Gateway Charter School, chartered by the Fresno Unified School District, was the subject of several newspaper articles and an ongoing law enforcement investigation, concerning allegations that satellites of the Gateway School were operating in violation of several laws. Gateway's charter was revoked by the district governing board who cited the difficulties of keeping track of remote (satellite) operations as a reason why various anomalies were not discovered sooner." (Sen. Education Analysis of Assem. Bill No. 1994, *supra*, pp. 2–3.) As stated in a comment to another analysis, "[b]y placing a geographic restriction on a charter school's operations, this bill would help clarify a district's sovereignty over public education provided within its boundaries and [would] enhance oversight of charter schools." (Sen. Com. on Appropriations, Dept. of Finance, Analysis of Assem. Bill No. 1994 (2001–2002 Reg. Sess.) as amended Aug. 15, 2002, p. 1 (Senate Finance Analysis of Assembly Bill No. 1994).)

The 2002 amendments provided that, from and after July 1, 2002, a school chartered by a district must identify a "single charter school that will operate within the geographic boundaries of that school district." (§ 47605, subd. (a)(1); see § 47605.1, subd. (a)(1).) The school may operate at multiple sites within the district so long as each location is identified in the petition. (§ 47605, subd. (a)(1).) A school chartered by a county board of education or by the State Board after an appeal from a denial by the school district "shall be subject to the same requirements concerning geographic location that it would otherwise be subject to if it receives approval from the entity to whom it originally submits its petition." (*Id.*, former subd. (j)(1).)[5]

There are limited exceptions to these restrictions. For example, if a charter school has unsuccessfully attempted to locate a single site within the district to house its entire program, it may establish *one* site outside the district, but within the county where the district is located. (§ 47605.1, subd. (d)(1).) Nothing in the CSA, however, either prohibits or discourages a charter school entity from establishing and operating charter schools in multiple districts around the state under a series of district- or county-approved charters.

The 2002 amendments added a new provision authorizing a county board of education to approve a "countywide" charter school in the first instance,

---

[5] Schools that provide instruction in partnership with the federal Workforce Investment Act of 1998 (Pub.L. 105-220 (Aug. 7, 1998) 112 Stat. 936), federally affiliated YouthBuild USA programs, federal job corps training or instruction, or the California Conservation Corps or local conservation corps, and schools that provide instruction to juvenile court school pupils in a residential facility are exempt from the geographic restrictions. (§ 47605.1, subd. (g).)

but the school must operate in "one or more sites within the geographic boundaries of the county." (§ 47605.6, subd. (a)(1).) A countywide charter petition may not be approved unless the county board finds that "the educational services to be provided by the charter school will offer services to a pupil population . . . that cannot be served as well by a charter school that operates in only one school district in the county." (*Ibid.*)

The amendments also authorized the State Board to approve "state charter school[s]" which would be permitted to operate without geographical restrictions. (Former § 47605.8, subd. (a).) Similar to the limitation imposed on county boards as chartering agencies, the Legislature directed that the State Board "may not approve a petition for the operation of a state charter school . . . unless [it] finds that the proposed state charter school will provide instructional services of statewide benefit that cannot be provided by a charter school operating in only one school district, or only in one county." (*Id.*, subd. (b).)[6]

## C. *Pertinent Regulations*

In accordance with statutory directives (former § 47605.8, subd. (a)), the State Board promulgated three regulations for the implementation of former section 47605.8 (Cal. Code Regs., tit. 5,[7] §§ 11967.6, 11967.7, 11967.8).[8] Insofar as pertinent here, regulations section 11967.6 provides a nonexclusive interpretation of the statutory phrase " '[i]nstructional services of a statewide benefit' " (subd. (b)), and requires that the charter petition's plan for instruction describe "how the instructional services will provide a statewide benefit . . . that cannot be provided by a charter school operating in only one school district, or only in one county" (subd. (a)(4)). Regulations section 11967.6 prescribes that a statewide charter applicant must demonstrate it has already been successful in operating charter schools (subd. (a)(7)), must describe how local community input for each school was or will be solicited (subd. (a)(8)), and must identify the school districts and counties in which each school will be located (subd. (a)(14)(B)), among other requirements (see generally subd. (a)).

Beyond this, the regulations do not set forth any procedures or guidelines used by the State Board or its constituent entities to review, evaluate, recommend, or approve statewide charter petitions.

---

[6] Section 47605.8 was amended in September 2007. (Stats. 2007, ch. 215, § 1.) Because the State Board's action on the petition of Aspire occurred in January 2007, the 2002 version of the statute applies and all future references to section 47605.8 and the CSA will be to that version. (Stats. 2002, ch. 1058, § 9.)

[7] All references to regulations are to title 5 of the California Code of Regulations.

[8] Regulations sections 11967.7 and 11967.8 are not relevant to the issues in this case.

## III. SUMMARY OF FACTS

Sometime in 2005 Aspire submitted a petition for a statewide charter. The petition proposed that Aspire would initially open two kindergarten-through-eighth-grade schools, one in the LAUSD and one in the SUSD, and by 2010 it would add five more schools, including high schools.

Prior to the submission of Aspire's petition, the chair of the Advisory Commission on Charter Schools (ACCS) reviewed a draft of the petition and provided advice to Aspire's chief executive officer on how the petition could be reworked in order to meet statutory requirements and receive State Board support. The ACCS was created in 2001, as authorized by statute, and serves as an advisory body to the State Board.[9]

During 2005–2006, Aspire's petition was reviewed by California's State Department of Education (CDE) staff. There is no record of what transpired with respect to this review, although it ultimately resulted in a report to the State Board, described *post*. Aspire's petition was also reviewed by the ACCS. In November 2005 the ACCS held a public meeting to consider, inter alia, Aspire's petition. After hearing Aspire's presentation and after a discussion among ACCS's members, the ACCS voted unanimously to recommend to the State Board that the petition be approved, with "the changes and conditions proposed by CDE staff." For reasons not explained in the record, Aspire's petition was not then forwarded to the State Board. Rather, it was again discussed briefly one year later, at the ACCS meeting of November 2006. The matter was not included on ACCS's published agenda. After this meeting Aspire's petition was sent on to the State Board.

Prior to the State Board's consideration of the petition, Fabian Nuñez (then Speaker of the Assembly) and Don Perata (then President pro Tempore of the Senate) sent a letter to the Board requesting a moratorium on approval of statewide charter schools until the scope of the enabling statute was clarified. Assemblymember Nuñez and Senator Perata took the position that the statute governing statewide charters was intended to apply only to charter schools that, by necessity, served a statewide student populace, such as the schools operated by the California Conservation Corps and federal job corps training agencies, and was not intended to apply to schools that merely sought to operate in several different locations throughout the state. The letter stated: " 'A multiple location charter school could and should seek approval of petitions in each school district or county office where it intend[s] to operate schools,' this being 'consistent with the principles of local control in the charter school law generally, and in [the 2002 amendment] more specifically. . . .' "

---

[9] Petitioners dispute respondents' claim that the ACCS is authorized to review and make recommendations on statewide charter petitions. (See pt. V.C.3., *post*, at pp. 1330–1331.)

The State Board's staff prepared a report describing Aspire's petition for a statewide charter. The report updated Aspire's accomplishments in the arenas of curriculum, teacher induction, and delivery of special education, and recommended approval of the petition, subject to numerous conditions, including the condition that "[i]f any deadline specified in these conditions is not met, approval of the statewide benefit charter is terminated unless the [State Board] deletes or extends the deadline not met." The staff report attached the CDE staff's "petition review form" which commented on the strengths and weaknesses of Aspire's petition, reviewed each of the required elements of Aspire's charter petition, and recommended various conditions of approval.

The State Board considered Aspire's petition at its January 11, 2007, meeting. Aspire's spokesperson made a presentation, followed by brief statements from a number of speakers both supporting and opposing the petition, followed by a discussion among members of the Board. The Board's deliberations centered primarily on how to interpret the finding requirement of former section 47605.8, subdivision (b), a matter of some dispute.[10] Ultimately, the petition was approved, subject to the conditions proposed by CDE. Two Board members voted to deny the petition because the Board had failed to address the issue of whether Aspire could accomplish its program through locally chartered schools.

By letter dated March 30, 2007, CSBA requested that the State Board rescind its approval of Aspire's statewide charter, on the ground that "the [State Board] failed to make adequate findings in support of its conclusion that Aspire was providing educational service of a statewide benefit that could not be provided through a locally approved charter, and that it appeared to be applying an incorrect legal standard in making such a finding." The State Board did not reply to the letter and did not rescind the approval.

Aspire's charter, as approved, contained several conditions relating to the opening and operation of the school sites, including the requirement that a memorandum of understanding (MOU) be executed to govern specific operational details. In March 2007, Aspire filed an amended charter with the State Board and an MOU was executed between Aspire and CDE. According to the petition and complaint, "[t]he MOU contained approximately 22 pages of requirements with which Aspire was required to comply, almost all

---

[10] Two members of the State Board expressed the view that if the benefits can be achieved through local charters, the statewide charter should not be approved. One Board member stated, "[t]his isn't an issue about the wonderful people in Aspire and the wonderful programs they have. The question is why can't they exist the way that the state law is designed for them to exist." The State Board's president, on the other hand, took the position that the statute allows an applicant freely to choose whether to apply for a state or local charter, and the Board simply decides "whether or not to approve that which comes through the state benefit charter process."

of which were required to be completed in advance of the opening of the schools in 2007 and which were made conditions of opening these schools." Based upon documents received by CSBA from the State Board in June and July of 2007, there was "almost [a] complete absence of compliance with the conditions of the MOU. In particular, LAUSD and SUSD [where Aspire's first two statewide charter schools were to be located] were not provided with the required 120 day notices for commencement of instruction." Additionally, it appeared there was no CDE determination that the proposed school facilities were in compliance with the MOU, nor did LAUSD or SUSD receive any notice of such determination, as required by regulations. According to petitioners' information and belief, as of October 2007 Aspire was operating schools in the LAUSD and the SUSD "notwithstanding the virtually complete failure to meet the conditions imposed by the charter and MOU."

## IV. PROCEDURAL SUMMARY

A. *The Petition and Complaint*

In October 2007, petitioners filed this action. They alleged, first, that the State Board's decision to approve Aspire's statewide charter was arbitrary and capricious and an abuse of discretion because the State Board misinterpreted the applicable statute and its finding was not supported by any evidence. CSBA requested a writ of mandate ordering the State Board to vacate the approval of Aspire's charter at the end of the academic year, and ordering compliance with former section 47605.8 with respect to future state charter school petitions.

In the second cause of action petitioners alleged that the State Board had a clear, present, and ministerial duty to enforce the conditions imposed on Aspire's charter and contained in the MOU and that its failure to do so, and its failure to rescind or take steps to terminate Aspire's charter, entitled CSBA to a writ of mandate ordering the State Board to rescind its authorization of Aspire's charter at the close of the school year.

In the third cause of action, petitioners alleged that the State Board used "policies and procedures" that were not adopted in compliance with the APA. More specifically, petitioners alleged that, although the State Board adopted regulations specifying the content of a statewide charter petition, it had never adopted regulations setting forth the procedures for review of such a petition—for hearings, amendments, or objections—nor for the role of the ACCS in reviewing the petitions. In the absence of such regulations, CSBA alleged, the policies and procedures used to approve Aspire's statewide charter were invalid and, therefore, the charter must be rescinded.

In their fourth and fifth causes of action, petitioners also sought injunctive and declaratory relief relating to these issues.

## B. *The Demurrers*

Aspire demurred to the second cause of action, and the State Board filed a separate demurrer to the third cause of action. The trial court sustained both demurrers, with leave to amend. CSBA did not file an amended complaint.

The State Board and Aspire then filed a joint demurrer to the first, fourth, and fifth causes of action. The central issue was whether the State Board's approval of Aspire's statewide charter petition was contrary to law, because it had made no finding, nor was there any evidence in the record to support a finding, that Aspire's instructional services of statewide benefit could not be provided through locally chartered schools.

The joint demurrer was sustained without leave to amend.[11] The trial court concluded that the State Board's approval of the statewide charter was not contrary to law because "[n]either the statutory scheme nor the regulations support Petitioners' contention that the [State Board] was required to find that Aspire's program could not continue to be provided through a series of locally-approved charters."

Judgment was entered, and this appeal followed.

## V. DISCUSSION AND ANALYSIS

### A. *First Cause of Action: Failure to Make the Finding Required by Former Section 47605.8*

#### 1. *Standard of Review*

All parties agree that the standard of review on appeal from the sustaining of a demurrer is de novo. This court must assume the truth of all factual matters properly pleaded and must consider matters that were judicially noticed below. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Because our review is de novo, we must also have in mind the proper standard for reviewing the action of a state agency. Where, as here, the

---

[11] Because the fourth and fifth causes of action (for injunctive and declaratory relief) were based upon the substantive claims of the first, second, and third causes of action, the demurrer to the fourth and fifth causes of action was also sustained without leave to amend.

petition seeks a writ of mandate under Code of Civil Procedure section 1085, our review is limited to a determination of whether the agency's decision was arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 [53 Cal.Rptr.2d 355].)[12] Independent review is required, however, where the issue involves statutory or regulatory construction, such as whether the agency's action was consistent with applicable law. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499].)

Respondents contend that, in conducting this independent review, we should accord great weight and respect to the State Board's statutory interpretation because of its "familiarity with statutes and regulations within its jurisdiction . . . and its expertise in interpreting them" (citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*)). In fact, the directives of *Yamaha* are more nuanced.

"Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' [Citation.]" (*Yamaha, supra,* 19 Cal.4th at pp. 7–8.) "The deference due an agency interpretation . . . turns on a legally informed, common-sense assessment of [its] contextual merit. 'The weight of such a judgment in a particular case' . . . 'will depend upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.*' (*Skidmore* [*v. Swift & Co.* (1944)] 323 U.S. [134,] 140 [89 L.Ed. 124, 65 S.Ct. 161], italics added.)" (*Id.* at pp. 14–15.)

---

[12] Petitioners raise the possibility that a different standard of review might apply because the State Board's approval of a charter petition might have been a quasi-judicial act (citing *B. C. Cotton, Inc. v. Voss* (1995) 33 Cal.App.4th 929, 953–954 [39 Cal.Rptr.2d 484] [exercise of discretion to grant or deny a permit or other type of application is a quasi-judicial function]). But the petition sounds in traditional mandamus, seeking a writ of mandate pursuant to Code of Civil Procedure section 1085. Respondents also make the point that approval of a charter school creates a "school district" (Ed. Code, § 47612, subd. (c)) and, therefore, is a quasi-legislative act (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168]).

Thus, while we operate from the presumption that an agency's interpretation of a statute is entitled to great weight, we must also consider the contextual merit of that interpretation, together with the rules of statutory construction, which we now summarize.

### 2. *Principles of Statutory Interpretation*

■ "While it is not the prerogative of the judiciary to rewrite legislation to conform to a *presumed* intent [citation], the Supreme Court reminds us that the primary purpose of statutory construction is for the courts to determine and effectuate the purpose of the law as enacted: 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But "[i]t is a settled principle of statutory interpretation that [the] language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.] . . . Thus, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.]' " (*McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 210–211 [89 Cal.Rptr.2d 295] (*McLaughlin*).)

■ " '[W]e do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' [Citation.] [¶] . . . 'An interpretation that renders related [statutory] provisions nugatory must be avoided. [Citation.] . . . [E]ach sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation].' [Citation.]" (*McLaughlin, supra*, 75 Cal.App.4th at p. 211.)

### 3. *The Parties' Contentions*

At the heart of petitioners' claim is the interpretation of this statutory provision: "The [State Board] may not approve a petition for the operation of a state charter school under this section unless [it] finds that the proposed state charter school will provide instructional services of statewide benefit that cannot be provided by a charter school operating in only one school district, or only in one county." (Former § 47605.8, subd. (b).)

The parties agree that the State Board, before approving a statewide charter, must first make a finding that the proposed charter school will provide "instructional services of statewide benefit." The parties disagree on

the interpretation of the balance of the provision ("that cannot be provided by a charter school operating in only one school district, or only in one county").

According to petitioners: "The 'ordinary' meaning of [the] language requires that before the [State Board] may approve a petition for statewide charter, it must not only find that the proposed instructional services constitute a statewide benefit, but also that those benefits cannot be achieved through a district or county approved charter . . . ." That is, the State Board must consider and decide whether the statewide charter applicant could accomplish the same statewide benefit if it operated each of its schools under individual charters approved by local school districts or by county boards.

According to respondents: The State Board must find that the proposed charter school will provide "instructional services of statewide benefit," and that it cannot provide that benefit "through a charter that only allows the [applicant] to operate *in one location.*" (Italics added.) In other words, the State Board must find that "the instructional services the [applicant] proposes will offer a statewide benefit that would be frustrated if the petitioner was only allowed to open a school in one county or [in one] district."

We note, parenthetically, that this was not respondents' position in the trial court. There, they argued that the State Board's "only legal obligation under section 47605.8 was to make a finding that Aspire would provide a statewide benefit prior to approving the charter." They contended the statute did not require the State Board to "explain why Aspire could not instead operate each of its schools under individual charters approved by local school districts."

At oral argument respondents' counsel sought to clarify this apparent inconsistency, explaining that it was respondents' intent to make the same argument on appeal as was made below. In either event, we conclude respondents' construction of the statute is insupportable.

4. *Statutory Language*

a. *Operating in Only One School District or in Only One County*

The statute is not a model of clarity. The phrase "that cannot be provided by a charter school operating in only one school district, or only in one county" is, on its face, conducive to the kind of literal construction respondents espouse, i.e., a finding that "the [applicant] will provide a statewide benefit that cannot be achieved through a charter that only allows the [applicant] to operate *in one location.*" (Italics added.) But this interpretation necessarily presumes that a charter school entity *can* be restricted to operating in "only . . . one location." As has been noted, the CSA neither

prohibits nor discourages a charter school entity from operating in multiple school districts under local charters. Indeed, as of 2005 Aspire itself was operating 17 charter schools around the state, under charters granted by seven different school districts. We therefore reject this interpretation of the statute as being inconsistent with the statutory scheme.

■ Although the terminology is awkward, we agree with petitioners that the phrase "operating in only one school district, or only in one county" (former § 47605.8, subd. (b)) refers to *each school* proposed under the statewide charter. In other words, approval of a statewide charter petition would require a finding that the school's "instructional services of statewide benefit" (*ibid.*) cannot be provided if the proposed schools (e.g., one located in the LAUSD, one in the San Francisco Unified School District, and one in the SUSD) were operated under charters from those districts.[13] This interpretation of the phrase, unlike respondents' interpretation, is consistent with other provisions of the CSA. It also makes practical sense because the statute contemplates that a statewide charter will operate in "multiple sites throughout the state." (Former § 47605.8, subd. (a).) It follows that the law would require the State Board to make a finding as to whether the applicant could achieve that same statewide benefit operating *each* of its proposed schools under local district or county charters.

b. *The Finding Requirement of Former Section 47605.8, Subdivision (b)*

At oral argument respondents argued, as they did below, that the statute requires the State Board to make only one finding—that the applicant's instructional services will provide a statewide benefit—and does not require the State Board to make an additional finding that the statewide benefit cannot be provided if the school operated under local charters. Respondents' reasoning is this: "instructional services of statewide benefit that cannot be provided by a charter school operating [under local charters]" is a single finding, not a dual one; that is, former section 47605.8, subdivision (b) *defined* "instructional services of statewide benefit" as a benefit that "cannot be provided by a charter school operating [under local charters]," therefore, once a "statewide benefit" has been found the statute's requirements have been satisfied.

We see nothing in the statute's plain language, in the statutory scheme of the CSA, or in the legislative history of former section 47605.8 that suggests this was what the Legislature intended. If the lawmakers intended to *define*

---

[13] This was, in fact, how the phrase "operating in only one school district, or only in one county" was understood by the parties in the trial court, and by the trial court itself.

statewide benefit as a "benefit that cannot be provided by a charter school operating [in local districts]" then presumably they would have so stated. Instead the Legislature provided that a statewide charter could not be approved unless the State Board "finds that the proposed state charter school *will provide* instructional services of statewide benefit *that cannot be provided* by a charter school operating [under local charters]." (Former § 47605.8, subd. (b), italics added.) The plain meaning of these words invokes a two-step analysis.

Additionally, respondents provide us with nothing in the statute, the CSA, or the legislative history that would support a conclusion that statewide benefits *cannot* be achieved under a series of local charters. In fact, respondents have conceded that Aspire's statewide instructional program could *possibly* (though not likely) be achieved through a series of local charters. If this is so, then the statute cannot mean what respondents say it means—that a "statewide benefit" is, *by definition*, a benefit that cannot be achieved under local charters.[14]

■ In sum, we conclude the plain language of the statute requires the State Board to find, before approving a statewide charter, that the applicant's instructional services will provide a statewide benefit, and that the benefit is one that cannot be provided under local charters. This interpretation is also reinforced by the statutory scheme, the structure of which reflects a preference for locally chartered schools.

### 5. *Statutory Scheme*

■ Section 47605 governs the approval of district charters. It provides that local school districts, in reviewing charter petitions, "shall be guided by the intent of the Legislature that charter schools are and should become an integral part of the California educational system and that establishment of charter schools should be encouraged." (§ 47605, subd. (b).) Local school districts are therefore *mandated* to approve charters that meet statutory requirements and are consistent with sound educational practices. (*Ibid.* ["*shall* grant a charter for the operation of a school" (italics added)].) Denial of a charter is not permitted except upon the issuance of "written factual findings, specific to the particular petition, setting forth specific facts to support one or more of the [statutorily enumerated] findings." (*Ibid.*)

---

[14] Thus, for example, respondents describe Aspire's primary "statewide benefit" as being a " 'catalyst for change.' " The record nowhere explains why Aspire cannot be a catalyst for change operating under its district charters. Indeed, it was contemplated by the Legislature in first authorizing charter schools that such schools would provide, inter alia, "vigorous competition within the public school system to stimulate continual improvements in all public schools." (§ 47601, subd. (g).)

The legislative policy with respect to statewide charters is the mirror image of the policy regarding district charters. Former section 47605.8, subdivision (b) *prohibited* the approval of a statewide charter petition unless specific findings can be made ("[t]he [State Board] *may not approve* a petition . . . unless . . ." (italics added)). Noticeably absent from the statute is any language requiring the State Board to be guided by the legislative intent that establishment of statewide charter schools should be encouraged. And, in contrast to provisions strictly limiting the grounds for the denial of a district charter, the State Board is never required to approve a statewide charter petition, and may deny the petition on any ground which the State Board finds to be justified. (*Id.*, subd. (d), incorporating by reference § 47605.6, subd. (b); see also § 47605.6, subd. (b)(6).)

Despite the Legislature's distinctly different approaches to district and statewide charters, respondents categorically reject the notion that the CSA expresses a preference for local charters because, as they argue, "the *substantive* requirements for charter school approval are the same for local and state charter schools." (Italics added.) The fact that all charter schools must satisfy uniform standards is neither surprising nor relevant. The critical question in this matter is whether the CSA is designed to encourage local chartering. That question is not affected by the substantive requirements for charter schools.

We also reject respondents' characterization of former section 47605.8 as "an indisputable legislative mandate to the [State] Board to authorize state charter schools that may operate without geographic or site limitations," as well as their contention at oral argument that the authorization of statewide charters was one of the primary objectives of the 2002 amendments. It seems to us unlikely that the Legislature would use proscriptive terms ("may not approve [a statewide charter] unless . . .") to declare a mandate. (Former § 47605.8, subd. (b).) Additionally, the notion that the statute constitutes a "mandate" runs contrary to the legislative history, which shows that the primary impetus behind the 2002 amendments was to tighten oversight of charter schools by, inter alia, prohibiting the establishment of schools that would operate in locations geographically distant from their chartering agencies.[15] (Sen. Education Analysis of Assem. Bill No. 1994, p. 2.)

---

[15] The statewide charter school provisions were added very late in the legislative process, only two weeks before the bill's passage. (Assem. Bill No. 1994 (2001–2002 Reg. Sess.) as amended Aug. 15, 2002, p. 1.) The late amendment came on the heels of a lobbying effort aimed at the Senate Committee on Education (Letters to Sen. Com. on Education regarding Assem. Bill No. 1994 (2001–2002 Reg. Sess.) dated June 20–25, 2002) organized by the California Network of Educational Charters (CANEC Listserv Announcement, June 20, 2002, URGENT).

■ This statutory scheme, we conclude, reflects an intent to promote district-chartered schools and local oversight while allowing for limited exceptions. Former section 47605.8 is one such exception, permitting the establishment of a charter school with no geographic restrictions only if it offers instructional services of a statewide benefit and only if that benefit would be frustrated if it operated its schools under district (or county) charters.

### 6. *Respondents' Other Contentions*

Respondents point to the regulation adopted by the State Board that requires statewide charter applicants to "[d]emonstrate success in operating charter schools previously approved in California." (Regs., § 11967.6, subd. (a)(7).) This regulation, respondents argue, negates the notion that the CSA favors local charters because this would place statewide charter applicants in a Catch-22—"although the regulations require that they demonstrate success in operating previously approved charter schools, that same success would . . . constitute a valid reason to deny such petitioners."

■ We think respondents' argument gives undue weight to this section of the regulation. But that is of no moment. Whatever bearing the regulation may have on the approval or denial of a statewide charter, it cannot control the statute's meaning. The scope or intent of a statute cannot be diminished or altered by a regulation purporting to interpret or implement it. (*Morris v. Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697] [regulation cannot alter or amend a statute or enlarge or impair its scope].)

Respondents assert as "obvious" the proposition that former section 47605.8 was adopted to "provide[] a mechanism for charter school operators to avoid the patchwork quilt of local school district approval. If plaintiffs had their way," respondents argue, "Aspire would be required to open each and every campus pursuant to different local chartering agencies, each with their own unique approval processes, oversight mechanisms, academic reporting requirements, special-education arrangements, and admission preferences—thus eliminating the uniform, statewide nature of Aspire's educational program." (Italics omitted.)

First, as we have already noted, the 2002 amendments were specifically designed to encourage locally chartered schools and to impose geographic restrictions on charter school operations that would help to "clarify a district's sovereignty over public education provided within its boundaries

and to enhance oversight of charter schools." (Sen. Finance Analysis of Assem. Bill No. 1994, p. 1.) Having chosen to impose such restrictions, it would make no sense for the Legislature to simultaneously create "a mechanism for charter school operators to *avoid* . . . local school district approval." We read former section 47605.8 as an exception to the CSA's chartering scheme, not as an equally available option for establishing a charter school.

In any event, respondents have not cited, and we have not located, anything in the record to support their assertions. There is no evidence that local chartering agencies have "unique" rules and requirements nor is there any evidence that "uniform, statewide" educational programming could not be achieved under a collection of district charters. To the contrary, Aspire's successful chartering of 17 schools in seven school districts—apparently utilizing a uniform model—suggests otherwise. As CDE's review of Aspire's charter application states, Aspire has achieved "moderate success" in improving academic achievement in their locally chartered schools, and the "curriculum and instructional methodologies proposed [for the statewide charter] are generally the same ones that have been used in Aspire's 11 other existing schools." In short, nothing in the record supports respondents' contention that former section 47605.8 was adopted so that schools could avoid the requirements of local chartering.[16]

### 7. *Was the Necessary Finding Made?*

Although respondents contend the State Board was not required to make a finding that the statewide benefit proposed by Aspire cannot be provided under local charters, they also contend that such a finding was made. In support, they cite to the transcript of the State Board's meeting where the statutory language was recited and voted upon. They further point to the trial court's conclusion that the State Board's finding was based on evidence before the State Board—specifically, Aspire's petition—which showed that its "proposed educational program, and operational plan, included unique factors and circumstances that could only be accomplished as a statewide benefit charter and not as a single district- or single county-authorized charter."

▇▇▇ The record is clear that the only finding made was the finding respondents contend was required, viz., the finding that Aspire's instructional services would provide a statewide benefit. The State Board did not have

---

[16] Two Aspire petitions for elementary schools in two school districts are included in the record. They appear to be virtually identical. Further, the statutory elements of Aspire's statewide charter petition are substantially similar to those elements of its district charter petitions. (See § 47605, subd. (b)(5).)

before it any evidence on the question of whether Aspire's "statewide benefit" could be provided under local charters. The State Board did not discuss or consider that question, and, in fact, two members of the State Board objected to the vote on Aspire's petition precisely *because* there was nothing before the State Board to support a finding that Aspire could not achieve its "statewide benefit" under local charters. Where an agency has a statutory duty to make findings, the mere recital of the statutory language does not satisfy the requirements of the statute. (Cf. *City of Stockton v. Marina Towers LLC* (2009) 171 Cal.App.4th 93, 114–115 [88 Cal.Rptr.3d 909].)

### 8. *Statewide Benefit*

Although the primary focus of the parties' briefing on appeal with respect to the first cause of action related to the construction of former section 47605.8, subdivision (b), the parties also disputed whether there was evidence in the record to support the State Board's finding that Aspire's program would provide "instructional services of statewide benefit." Petitioners alleged that such a finding could not be made because Aspire's proposed instructional services were not "materially different from the services provided by [its] existing charter schools operating in individual districts." Because we reverse the judgment on other grounds we need not address this question, but we pause to observe that the record contains no analysis of whether the elements of Aspire's statewide benefit constituted "[u]nique factors and circumstances" (regs., § 11967.6, subd. (b)(1)), or were merely restatements of the elements of its existing programs, being operated under local charters.[17] It is for the trial court to make further determinations on this issue.

### 9. *Conclusion*

Petitioners have alleged that the State Board did not make the findings required by the statute in approving Aspire's charter petition. Because this allegation has merit, the joint demurrer should have been overruled. We, therefore, reverse the judgment and ruling on the first cause of action, and remand for further proceedings, consistent with this opinion.

### B. *Second Cause of Action: Failure to Enforce Charter Provisions*

#### 1. *Petitioners' Allegations*

For ease of reference, we repeat here the essential allegations of the second cause of action:

---

[17] We also note in passing that there appeared to be no consensus among the members of the State Board as to the meaning of the term "instructional services of statewide benefit." A vote on Aspire's petition was nevertheless taken because the majority was unwilling to delay the decisionmaking process in order to resolve that issue, which was left for another day.

Aspire's charter was approved by the State Board subject to specific conditions relating to the opening and operation of school sites, including the execution of an MOU to govern specific operational details. "One of the conditions was that 'CDE final findings and recommendations must be addressed in the specified timeframes' *before* any individual school sites could be opened. Another condition also provided that if any deadline was not met, approval was terminated 'unless the [State Board] deletes or extends' the deadline."

Aspire thereafter filed an amended charter with the State Board and an MOU was executed between Aspire and CDE. "The MOU contained approximately 22 pages of requirements with which Aspire was required to comply, almost all of which were required to be completed in advance of the opening of the schools in 2007 and which were made conditions of opening these schools." Based upon documents received by CSBA from the State Board in June and July of 2007, there was "almost [a] complete absence of compliance with the conditions of the MOU." Additionally, LAUSD and SUSD were not provided with the required 120-day notices for commencement of instruction.[18] Further, there was no CDE determination that the proposed school facilities were in compliance with the MOU, and neither LAUSD nor SUSD received any notice of such determination, as required by regulation. (Regs., § 11967.7, subd. (a).)

As of October 2007, Aspire was operating its statewide charter schools in the LAUSD and the SUSD, "notwithstanding the virtually complete failure to meet the conditions imposed by the charter and MOU, and [the State Board's] failure to enforce the legal requirements and/or the conditions of approval." The State Board's failure to enforce provisions of the CSA and its own conditions of approval, and its "continued failure or refusal to enforce such requirements is arbitrary and capricious, an abuse of discretion and contrary to law."

The petition sought a writ of mandate requiring that the State Board carry out its "clear, present, and ministerial duty to enforce the provisions of the CSA and the conditions of approval [of the charter], including those contained in the MOU, and to take affirmative actions to rescind and/or to revoke the approval of any charter wrongfully approved and/or operating in violation of the law and the conditions of its approval."

---

[18] Petitioners allege that this notice requirement was contained in the MOU. This is incorrect. The notice requirement is in the regulations. Regulations section 11967.6, subdivision (a)(10) requires that the statewide charter petition "[i]nclude an assurance that the school district[s] and county superintendents where each school will be located will be notified at least 120 days prior to commencement of instruction."

### 2. *Aspire's Demurrer*

The trial court sustained Aspire's demurrer to this cause of action on the ground, advanced by respondents, that the State Board did not have a "mandatory duty to terminate or revoke Aspire's charter based on (1) Aspire's alleged failure to comply with the conditions of the [MOU] or (2) [the State Board's] alleged failure to enforce those conditions or certain provisions and regulations of the [CSA]." Petitioners contended they were not seeking a writ of mandate requiring the State Board to revoke the charter *under section 47607*, but were seeking a writ of mandate requiring the State Board to enforce both the law and the deadlines and conditions *imposed by the State Board* which were never waived or extended by the State Board's action. The trial court rejected this argument, concluding that "revocation of Aspire's . . . charter and an injunction to force [the State Board] to revoke future charters is the only relief sought in the prayer to the Second Cause of Action."

### 3. *Revocation of Aspire's Charter Under Section 47607 Was Not the Only Relief Requested*

In reviewing the sufficiency of a complaint against a general demurrer, it is long settled that "[t]he complaint must be liberally construed and given a reasonable interpretation, with a view to substantial justice between the parties." (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1111 [62 Cal.Rptr.3d 59].) While the petitioners' pleading does engender some confusion, a liberal reading of its allegations manifests a request that the court order enforcement of the CSA, the MOU, and the conditions of approval *including* the condition that the approval would be rescinded for failure to comply with its preconditions in the absence of State Board action to extend or eliminate the applicable deadline. Petitioners also sought an order compelling the State Board to revoke and/or terminate the charter. Thus, revocation of Aspire's charter under section 47607 was not "the *only* relief sought in the prayer to the Second Cause of Action." (Italics added.) We, therefore, examine whether mandamus will lie either to enforce the charter's conditions of approval or to require the State Board to revoke the charter.

### 4. *Is Mandamus Available to Enforce Conditions of Approval?*

The State Board is an agency authorized to exercise its discretion in the approval and formation of a statewide charter school, a quasi-legislative act. In this respect it is like any other state or local agency that can be the subject of a writ of mandate to implement quasi-legislative acts that have been duly adopted. Thus, in *Harbach v. El Pueblo de Los Angeles etc. Com.*

(1971) 14 Cal.App.3d 828 [92 Cal.Rptr. 757], a joint state and local commission adopted a resolution to relocate and restore a historical building, but refused to carry through with the project. The Court of Appeal affirmed the trial court's issuance of a writ of mandate concluding that, while adoption of the resolution was discretionary, its implementation was not. The resolution "was passed unanimously by the Commission . . . ; it has never been rescinded or modified, and remains in full force and effect. The individual members of the Commission have thereby exercised their discretion in deciding to relocate the [building], and now it is the ministerial task of the Commission to implement the resolution. The Commission's duty remains until the resolution is effectively implemented, or the members of the Commission again exercise their discretion . . . to rescind or modify the resolution." (*Id.* at p. 834; see also *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 186 Cal.App.3d 814, 834–835 [230 Cal.Rptr. 875] [if condition of approval imposed on a development project is clear and unambiguous, city has a ministerial duty to enforce it].) Accordingly, the conditions imposed by the State Board in its official, quasi-legislative action approving Aspire's charter can be a proper subject of mandamus.

Whether the specific conditions of approval imposed by the State Board on Aspire's charter are actually enforceable by writ of mandate involves many questions that cannot be answered on the bare pleading. After further proceedings it may be determined that most or all of the unsatisfied conditions are subject to discretionary interpretation and therefore are not amenable to mandamus (see, e.g., *Blankenship v. Michalski* (1957) 155 Cal.App.2d 672, 675–676 [318 P.2d 727]), or are only breaches of contractual obligations not subject to enforcement by writ of mandate (*McDonald v. Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 442 [111 Cal.Rptr. 637]), or have been rendered moot by either the passage of time or corrective action (*Environmental Protection Information Center, Inc. v. Maxxam Corp.* (1992) 4 Cal.App.4th 1373, 1380 [6 Cal.Rptr.2d 665]). But at this very preliminary stage of the proceedings, we cannot conclude as a matter of law that no cause of action lies for enforcement of the conditions imposed on Aspire's charter.[19]

### 5. *Is Mandamus Available to Compel Revocation of a Charter?*

Section 47607 provides, as here relevant, that "[a] charter *may be revoked*" (subd. (c), italics added) by the chartering agency if it finds that the charter school committed "a material violation of any of the

---

[19] Respondents argue that all of the provisions of the MOU are merely contractual and are not subject to mandamus on that basis, because "[i]t is uncontested that the MOU was not required by law." The MOU and many of its provisions, however, were required by the State Board as conditions of approval and, therefore, the MOU itself is at least theoretically enforceable as a condition.

conditions, standards, or procedures" of the charter (subd. (c)(1)) or a violation of "any provision of law" (subd. (c)(4)). By its plain language, the statute grants to chartering authorities broad discretion in initiating revocation proceedings against charter schools. This does not mean, however, that a chartering entity has absolute discretion to take no action against a school that violates the law or its charter.

 The chartering of a school and the charter school's compliance with the law, the regulations, and the conditions imposed on its charter can be matters of serious concern to the public and to our public school system. More than 10 years ago, in *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1135 [89 Cal.Rptr.2d 745] (*Wilson*), the legitimacy of the CSA was challenged on the ground, among others, that it violated the constitutional mandate of state control over public schools because it transferred power over essential educational functions to the parents and teachers who write the charters and to the entities that operate the charter schools. In rejecting that challenge, Division Four of the First Appellate District concluded that charter schools are not just nominally, but are effectively, under the control of state officials through the charter approval process, through continuing oversight and monitoring powers, through unlimited access for inspection and observation, and through the power to revoke a charter in the face of serious breaches of financial or educational responsibilities or for violations of the law. (*Id.* at pp. 1138–1141; see *id.* at p. 1139 ["we wonder what level of control could be more complete than where, as here, the very destiny of charter schools lies solely in the hands of public agencies and offices . . ."].) As the court explained, "under this scheme, charter school officials are officers of public schools to the same extent as members of other boards of education of public school districts. So long as they administer charter schools *according to the law and their charters*, as they are presumed to do, they stand on the same constitutional footing as noncharter school board members. If they violate the law, the charter will be revoked." (*Id.* at p. 1141, italics added.)

It is, thus, the very control and oversight by public officials that legitimize charter schools. If monitoring and enforcement are, in reality, either lax or nonexistent, then the entire statutory scheme governing charter schools is called into question. Local school districts and county boards of education, as well as parents and teachers, have a right to expect that charter schools will hew not just to the law, but to their charters and the conditions imposed upon them through official action taken at a public hearing. We, therefore, cannot agree with the State Board's contention that because section 47607 authorizes but does not compel a chartering agency to revoke a charter, no person or entity can ever challenge the agency's failure to act by way of writ of

mandate. Using an extreme example, if the State Board turned a blind eye to a statewide charter school that was charging tuition and promoting religious tenets in violation of its charter and of the law, an action in mandamus would lie seeking to compel the State Board to take corrective action.

We acknowledge that courts should generally " 'let administrative boards and officers work out their problems with as little judicial interference as possible [because] boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' " (*Lindell Co. v. Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4].) But this does not mean that boards and officers may refuse to act, or may act with unfettered discretion. "Mandamus may issue . . . to compel an official both to exercise his discretion (if he is required by law to do so) and to exercise it under a proper interpretation of the applicable law." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) "Where only one choice can be a reasonable exercise of discretion, a court may compel an official to make that choice." (*California Correctional Supervisors Organization, Inc. v. Department of Corrections* (2002) 96 Cal.App.4th 824, 827 [117 Cal.Rptr.2d 595].)

Here, the State Board approved the petition "subject to" compliance with certain "conditions for the opening and operation of school sites." We are confronted with an allegation that these schools were operating in October 2007, "notwithstanding the virtually complete failure to meet the conditions imposed by the charter and MOU, and [the State Board's] failure to enforce the legal requirements and/or the conditions of approval." In the face of this allegation we cannot presume the school is operating "according to the law and [its] charter[]." (*Wilson, supra,* 75 Cal.App.4th at p. 1141.) And, although more than two years have passed, we must accept that this static set of facts remains; because this matter was decided on demurrer, there is no evidence before us concerning the satisfaction of any of the conditions.[20]

We must, therefore, conclude that petitioners stated a legally cognizable claim and the demurrer to the second cause of action should have been overruled.

C. *Third Cause of Action: Violation of the APA*

Petitioners' third cause of action alleged that the State Board "is . . . using policies and procedures in connection with its consideration of statewide

---

[20] The State Board argues there is evidence that all *regulatory* requirements were satisfied, and points to certain correspondence that was the subject of a request for judicial notice in the trial court. The content of the correspondence, however, is not a proper subject of judicial notice and the trial court correctly so noted, ruling that it "does not take judicial notice of the truth of [the] assertions or findings stated in those documents."

charter petitions that have not been adopted in compliance with Government Code [section] 11500 *et seq.*, the [APA]" and, therefore, the court should compel the rescission of Aspire's charter which was approved pursuant to these policies and procedures. The question posed is a narrow one: Are the allegations of the petition and complaint sufficient to survive a demurrer? Our answer is yes. Petitioners' claim cannot be rejected as a matter of law on the pleadings and this limited record.

## 1. *The APA*

 "The APA was enacted to establish basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations promulgated by administrative agencies. [Citations.] A major purpose of the APA is to provide a procedure for persons or entities affected by a regulation to be heard on the merits in its creation, and to have notice of the law's requirements so they can conform their conduct accordingly. [Citation.] Because of this, any doubt as to the applicability of the APA's requirements should be resolved in favor of the APA. [Citations.] [¶] ' "If a rule constitutes a 'regulation' within the meaning of the APA . . . it may not be adopted, amended, or repealed except in conformity with 'basic minimum procedural requirements' [citation] that are exacting.[21] . . . Any regulation or order of repeal that substantially fails to comply with these requirements may be judicially declared invalid. [Citation.]" [Citation.]' " (*Morales, supra,* 168 Cal.App.4th at pp. 735–736.)

 The APA defines " '[r]egulation' " as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.) "A regulation subject to the APA . . . has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. . . . Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's]

---

[21] " ' "The agency must give the public notice of its proposed regulatory action ([Gov. Code], §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (*id.*, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (*id.*, § 11346.8); respond in writing to public comments (*id.*, §§ 11346.8, subd. (a), 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (*id.*, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity. (*Id.*, §§ 11349.1, 11349.3.)" ' " (*Morales v. California Dept. of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 729, 736 [85 Cal.Rptr.3d 724] (*Morales*).)

procedure.' [Citation.]" (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*).)

A regulation need not be adopted pursuant to the APA, however, if it would merely duplicate statutory standards or procedures. As explained in *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 336 [42 Cal.Rptr.3d 47, 132 P.3d 249] (*Morning Star*), " '[i]f certain policies and procedures . . . are . . . "essentially [] a reiteration of the extensive statutory scheme which the Legislature has established" . . . then there is obviously no duty . . . to enact regulations to cover such reiterations . . . . [Citation.] But to the extent any of the contents of the [statement of policy or procedure] depart from, or embellish upon, express statutory authorization and language, the [agency] will need to promulgate regulations.' [Citation.]"

The APA also does not govern a "regulation that relates only to the internal management of the state agency." (Gov. Code, § 11340.9, subd. (d).)

> 2. *Whether Regulations Must Be Promulgated for the Policies and Procedures Governing Review and Approval of Statewide Charter Petitions Cannot Be Determined on Demurrer*

Petitioners have alleged that, in considering statewide charter petitions, the State Board is using policies and procedures that have not been adopted under the APA. More particularly, petitioners alleged: "While the [State Board] has adopted regulations that specify the required contents of a statewide charter petition and define 'instructional services of a statewide benefit,' the [State Board] has never adopted regulations governing the process of review or the role of the ACCS with respect to statewide charter petition review. Specifically, the use of the ACCS to review and make recommendations with respect to statewide charter petitions has never been subject to the rulemaking requirements of the [APA] and its public comment provisions. Nor has the [State Board] ever adopted regulations setting forth the process to be used for ACCS (or other) review of petitions for statewide charters, for hearings on those petitions, for amendments to petitions, for objections to such petitions, or for making decisions with respect to such petitions." Petitioners also alleged that the ACCS was formed in 2001 by California State Board of Education Policy No. 01-04 (Policy No. 01-04) to advise the State Board in a number of areas pertaining to charter schools but these do "not include consideration of statewide charter petitions."

On their face these allegations state a claim, albeit skeletal, for violation of the APA, which requires that "every rule, regulation, order, or standard of

general application . . . adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure" be adopted pursuant to the provisions of the APA. (Gov. Code, § 11342.600; see *id.*, § 11340.5.)

Respondents do not directly address these allegations. Instead, they contend that petitioners are not really challenging the absence of valid regulations but are "trying to invalidate the [State] Board's *use* of an advisory body [the ACCS] . . . to review statewide charter petitions." (Italics added.) Having thus reframed the issue, respondents assert "there is not a single California case that supports the proposition that a state agency's *use* of a purely advisory body constitutes an 'underground regulation.' " (Italics added.) According to respondents, four "undisputed facts" support the claim that "the [State] Board's use of the ACCS does not violate the APA": (1) the ACCS was "lawfully created pursuant to legislative mandate," (2) the ACCS provides recommendations to the State Board that are purely advisory, (3) the regulation that defines "instructional services of a statewide benefit" was lawfully promulgated and was followed by the ACCS, and (4) the ACCS's meetings are subject to the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.) and, therefore, open to the public.

While respondents' contention has its own internal logic, it is largely unmoored to the actual allegations of the complaint or to relevant legal principles. Putting aside for the moment the question of petitioners' *actual* theory, we observe that the four assertedly "undisputed facts" do not compel any dispositive legal conclusion.

### 3. *The Formation and the Role of the ACCS*

First, contrary to respondents' assertions, the formation of the ACCS had nothing to do with statewide charter schools. Its creation was authorized by statute for the purpose of recommending to the State Board criteria to be used in determining the funding mechanism for nonclassroom-based instruction in charter schools. (§ 47634.2.) The State Board thereafter adopted Policy No. 01-04, which expanded ACCS's role to include advice on "all aspects of the State Board's duties under the Charter Schools Act of 1992." (Italics omitted.) But that policy predates the adoption of former section 47605.8 and says nothing about using the ACCS to review statewide benefit charter school petitions.[22] And, although it is undisputed that the ACCS is only an advisory

---

[22] The State Board asserts that Policy No. 01-04 does include as part of ACCS's duties advice regarding " 'the selective granting of charters' " and that this "language applies to state charter schools as much as it does to local ones." This contention is misleading. Policy No. 01-04 refers to advice with respect to the Board's role in the "[s]elective granting of charter petitions *that have been denied or not renewed by local education agencies, but that*

body, this fact does not exempt its policies and procedures from the APA. (Cf. *Engelmann v. State Bd. of Education* (1991) 2 Cal.App.4th 47, 51–52, 62 [3 Cal.Rptr.2d 264] (*Engelmann*) [process utilized to select textbooks, including policies and procedures of advisory committees, is subject to APA].)

Further, respondents' assertion that the ACCS merely followed the regulatory definition of "instructional services of statewide benefit" in making its recommendation to the State Board is not supported by any citations to the record. In any case, this fact, even if true, does not respond to petitioners' allegations that there are no "regulations setting forth the *process* to be used for ACCS (or other) review of petitions for statewide charters, for hearings on those petitions, for amendments to petitions, for objections to such petitions, or for making decisions with respect to such petitions." (Italics added.)

Finally, it is undisputed that the ACCS is required by law to post its agendas on the Internet 10 days prior to its meetings (Gov. Code, § 11125, subd. (a)), and to hold meetings that are open to the public (*id.*, § 11123). But this fact does not, as a matter of law, either satisfy or nullify APA requirements. The mere opportunity to be present at the end-stage of a behind-the-scenes evaluation process is not the equivalent of having an opportunity to be involved in the development of the standards, policies, and procedures that will govern that process. (*Engelmann, supra*, 2 Cal.App.4th at pp. 51–52, 62 [State Board made specific provision for applicants to be heard by advisory committees and to respond to their criticisms; the court nevertheless issued a writ of mandate requiring compliance with the APA to the extent procedures and policies departed from or embellished upon statutory scheme].)[23]

In sum, respondents' four factual assertions do not support the conclusion that its policies and procedures for review of statewide charter petitions do not violate the APA as a matter of law.

### 4. *Petitioners' Actual Theory and Respondents' Contentions*

More fundamentally, we disagree with respondents' characterization of petitioners' theory underlying the APA claim. Although petitioners do call into question the legitimacy of the ACCS's role in the statewide charter

---

*the State Board determines to have met statutory requirements.*" (Italics added.) This provision quite clearly applies to appeals from denials of local charters and not to applications under former section 47605.8.

[23] Petitioners also contend that any salutary effects of the open-meeting rule were negated here because significant changes were made to the petition *after* it was voted upon by ACCS at its noticed public meeting. It is not clear, however, whether the earlier version of the petition contained in the record was the version actually voted on by the ACCS. Further, while there are substantial differences in the two petitions it cannot be known on this record whether the changes were made before or after the ACCS held its public meeting.

petition process because neither its statutory authorization nor its formation document (Policy No. 01-04) assigns it any such role, that is not their only complaint. Petitioners also allege that, having been assigned an active part in the process, the ACCS's policies and procedures in carrying out their responsibilities must be—and have not been—promulgated under the APA. As explained in their reply brief: "The issue is . . . not whether the APA 'invalidates' or makes illegal the use of advisory bodies, as Respondents urge. . . . If the agency wishes to use an advisory committee, nothing in the APA proscribes it, but the agency must provide notice to the public by undertaking the required rulemaking process so that the pros and cons can be weighed and the scope of the committee's authority and the process by which it will operate is clear to the public."

Respondents argue that petitioners failed to state a cause of action under the APA because they did not allege that the ACCS is using any standards of general applicability to evaluate charter petitions other than the standards set out in the statutes and regulations governing statewide charter schools, and that petitioners cannot "reasonably argue[] that the ACCS recommendation was based on any criteria other than that which is set forth in section 47605.8 and Regulation[s section] 11967.6." Respondents assert that the ACCS simply "applied the formally adopted regulations" when it "analyzed Aspire's petition."

Respondents, however, do not cite to anything in the record that would support this assertion.[24] Our own review of the record has uncovered nothing that describes the " 'policies, procedures, standards, criteria, regulations and evaluation instruments' " (*Engelmann, supra*, 2 Cal.App.4th at p. 62) used by the ACCS to "implement, interpret, or make specific" (Gov. Code, § 11342.600) Education Code former section 47605.8 when it analyzed Aspire's petition and made its recommendation. Neither the statute, nor the regulation, nor Policy No. 01-04 provides any language that governs the ACCS's role in reviewing statewide charter petitions or the standards or policies it utilizes in making its recommendations to the State Board. Accordingly, the APA claim cannot be addressed on demurrer.[25]

---

[24] Respondents point to two admissions contained in the complaint: (1) that regulations section 11967.6 "specif[ies] the required contents of a statewide charter petition and define[s] 'instructional services of a statewide benefit,' " and (2) that a " 'recitation' of the proposed elements of Aspire's instructional services of a statewide benefit" occurred at the ACCS meeting. (We note that the "recitation" was made not by an ACCS member but by Aspire's spokesperson.) These bare admissions do not rule out the possibility that the ACCS relied on policies and procedures other than those found in the regulations.

[25] We note that the legislative authorization for the ACCS—to assist the State Board in determining the proper level of funding for nonclassroom-based instruction in charter schools—resulted in the promulgation of exceedingly detailed regulations providing specific procedures as well as numerous standards and guidelines to be used by the ACCS in

Additionally, the record does not support respondents' characterization of the ACCS's action as being limited to making a recommendation that applied statutory and regulatory criteria to Aspire's petition. It appears, rather, that the ACCS took a far more hands-on approach. There is evidence that the chair of the ACCS reviewed a draft of Aspire's charter petition and sent a detailed e-mail to the chief executive officer of Aspire advising him on how the petition could be improved, including how to formulate the petition in terms of strategic themes that would show a statewide benefit and garner State Board support. The ACCS member from CDE indicated "it had been a pleasure to work with Aspire . . . representatives in shaping statewide benefit charter petitions," and that "[u]nlike petitions being considered on appeal, there is much more flexibility to work collaboratively with petitioners," describing the process as "much more proactive." This indicates that the ACCS's analysis is not limited to the mere application of "formally adopted regulations" to review state charter petitions.

In so noting, we do not criticize the ACCS for the work it has done, which appears to us to be conscientious and commendable. Indeed, respondents defend these interactions as entirely proper and we do not disagree. We cite these facts only to demonstrate that the question of whether the ACCS's policies and procedures " 'depart from, or embellish upon, express statutory authorization and language,' " or are merely " ' "a reiteration of the . . . statutory [and regulatory] scheme" ' " (*Morning Star, supra,* 38 Cal.4th at p. 336) cannot be decided on demurrer. Petitioners have *alleged* the State Board and the ACCS are using policies and procedures for consideration of statewide charter petitions that have not been adopted in compliance with the APA. Whether or not petitioners can prove these allegations, they are not required to prove them at the pleading stage.

### 5. *The Internal Management Exception Does Not Apply*

In the alternative, respondents claim the APA does not govern the ACCS's operations because "rules that relate only to the mechanics of [the State Board's] review process—such as the forwarding of charter petitions to CDE staff, or the inclusion of the ACCS's recommendation in the materials provided to [State] Board members—are provisions that relate to [the State Board's] internal management of its operations, and thus are exempt from the APA." This argument fails for two reasons. First, the record shows that the

developing its recommendation to the State Board. (Regs., § 11963 et seq.) The comprehensive nature of these regulations is in sharp contrast to the complete absence of formal regulations governing ACCS's activities with respect to its recommendations on statewide charter petitions. In observing this contrast, however, we express no view as to the necessity of similar regulations in connection with the ACCS's review of statewide charter petitions.

ACCS's role in the State Board's review process was not limited to forwarding the petition to CDE staff and making a recommendation to the State Board. Second, as we explain, the internal management exception to the APA does not apply to a decisionmaking process that implicates the interests of persons and entities outside the state agency.

Government Code section 11340.9, subdivision (d) does exclude from APA requirements any standard or rule that "relates only to the internal management of the state agency." (See *Americana Termite Co. v. Structural Pest Control Bd.* (1988) 199 Cal.App.3d 228, 233 [244 Cal.Rptr. 693] [board's methodology for determining which companies to select for investigation under its enforcement program was only an "internal enforcement and selection mechanism" and not a regulation].)

 The internal management exception, however, is a narrow one, as demonstrated by a line of cases consistently rejecting its application—even where the policies govern internal administrative matters—if the policies or procedures affect the interests of persons other than the agency itself. (See, e.g., *Grier v. Kizer* (1990) 219 Cal.App.3d 422, 427–428, 436–438 [268 Cal.Rptr. 244], disapproved on another ground in *Tidewater, supra,* 14 Cal.4th at p. 577 [sampling method selected to audit physician claims, affects payments to physician]; *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 203–204 [149 Cal.Rptr. 1, 583 P.2d 744] (*Armistead*) [provision in personnel transactions manual governing manner in which resignation may be withdrawn relates to termination of employment, "a matter of import to all state civil service employees"]; *Stoneham v. Rushen* (1982) 137 Cal.App.3d 729, 731, 736 [188 Cal.Rptr. 130] [administrative bulletins issued by Director of Corrections creating point system to classify inmates for purpose of determining custody level and housing, affects the prison population]; *Poschman v. Dumke* (1973) 31 Cal.App.3d 932, 942–943 [107 Cal.Rptr. 596], disapproved on another ground in *Armistead, supra,* 22 Cal.3d at p. 204, fn. 3 [procedures governing the granting or denial of tenure, "a matter of serious consequence involving an important public interest"].)

Petitioners have alleged that they are directly affected by the approval of statewide charter schools and have an interest in ensuring their legitimacy. These allegations are sufficient to overcome the State Board's contention on demurrer that the policies and procedures governing the ACCS's review of and recommendations on statewide charters are merely matters of internal management.

## VI. CONCLUSION AND DISPOSITION

The demurrers to the first three causes of action should not have been sustained. Accordingly, we reverse as to those causes of action and also as to the fourth and fifth causes of action seeking injunctive and declaratory relief predicated on the same allegations.

The judgment is reversed and the cause is remanded.

Ruvolo, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied August 24, 2010, and the opinion was modified to read as printed above. The petitions of all respondents for review by the Supreme Court were denied November 17, 2010, S186129.